FILED

# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### ALEXANDRIA DIVISION

|  |  |  |
|---|---|---|
| NATIONAL ASSOCIATION OF HOME BUILDERS, *et al.*, | ) ) ) | |
| Plaintiffs, | ) | |
| v. | ) | Civil Action No. 08-CV-1324 (CMH/TCB) |
| | ) | |
| STEVE PRESTON, Secretary, United States Department of Housing and Urban Development, and UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, | ) ) ) ) ) ) | |
| Defendants. | ) | |

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT
## OF THEIR MOTION FOR PRELIMINARY INJUNCTION

Plaintiffs, through counsel, respectfully submit this Memorandum of Law in Support of their Motion for Preliminary Injunction.[1] Plaintiffs seek to enjoin the amendments made by the United States Department of Housing and Urban Development ("HUD") to the definition of

---

[1] Plaintiffs include (a) the National Association of Home Builders ("NAHB"); (b) the following homebuilders: NVR, Inc.; Centex Homes; D.R. Horton, Inc.; The Drees Company; Hovnanian Enterprises, Inc.; KB Home; Meritage Home Corporation; M.D.C. Holdings, Inc.; M/I Homes, Inc.; Pulte Homes, Inc.; Shea Homes LP; Taylor Morrison, Inc.; and Weekley Homes, LP (collectively, along with the NAHB, referred to herein as "the Homebuilders"); (c) the following mortgage lenders that are affiliates of the Homebuilders: NVR Mortgage Finance, Inc.; First Heritage Mortgage LLC; Intercoastal Mortgage Co.; First Continental Mortgage, Ltd.; AMS Partners, L.P.; Built Around Your Mortgage Funding, LP; FC Lending, Ltd.; Prestige Lending Services, Ltd.; Priority Home Mortgage, Ltd.; Virden Mortgage Services, LP; and West Oaks Financial, Ltd.; CTX Mortgage Co., LLC; DHI Mortgage Company, Ltd.; First Equity Mortgage, Inc.; K. Hovnanian American Mortgage, LLC; MTH Mortgage, LLC; M/I Financial Corp.; Pulte Mortgage LLC; and Ryland Mortgage Company (collectively referred to herein as "the Affiliated Mortgage Lenders"); and (d) the following title companies that are affiliates of the Homebuilders: Eastern Title Agency, Inc. and DHI Title of Texas, Ltd. (collectively referred to herein as "the Affiliated Title Companies") (the Affiliated Mortgage Lenders and the Affiliated Title Companies are collectively referred to herein as "the Affiliated Companies").

"required use" contained in 24 C.F.R. § 3500.2 from becoming effective on their scheduled implementation date, January 16, 2009.

## INTRODUCTION

Enacted in 1974, the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. §§ 2601-2617, was designed to eliminate certain practices, specifically, kickbacks or referral fees that Congress determined were unnecessarily increasing the costs of certain real estate settlement services. Importantly, Congress recognized that certain referral arrangements were beneficial to consumers, and in 1983 it created an exemption to the blanket prohibition against referral fees for business arrangements between affiliated entities, as long as certain disclosures are made to borrowers, borrowers are not required to use the affiliated business – i.e., no "required use" – and the affiliated businesses do not exchange the types of kickbacks and referral fees otherwise prohibited by RESPA. Nine years later, in 1992, HUD finally issued its regulatory guidance on Congress' affiliated business arrangement exemption. In it guidance, HUD determined that under the 1983 amendment "*bona fide* discounts and certain packaging of settlement services which provide options are not violations of the 'required use' provision [of RESPA]." 57 Fed. Reg. 49,600, 49,603 (Nov. 2, 1992).

This lawsuit challenges HUD's complete reversal of its 1992 position and its arbitrary and capricious decision to declare that the plain language of RESPA now prohibits – rather than permits – the offering of incentives by homebuilders, even though all of the RESPA requirements, including disclosure, bona fide discounts, and limitations on fees, have been met. HUD's unreasonable and unsupportable reading of the statute will result in the loss of thousands of jobs in the mortgage lending industry, which has already been devastated by the current economic downturn. Further, many companies will be forced to close because their business

model was structured on the plain language of the statute, and HUD's prior common sense interpretation, which, until a month ago, was that homebuilders could participate in the offering of incentives and discounts. There is simply no justification for HUD's newfound reading of RESPA. Specifically, the Final Rule impermissibly broadens the prohibition against "required use" as it relates to RESPA to include *all incentives* offered by homebuilders, while at the same time allowing other settlement service providers (such as realtors and mortgage brokers) to offer such incentives. According to HUD, an "incentive" offered by a homebuilder to choose a specific settlement service provider is a "requirement" to use that provider. But encouraging is not requiring; thus, HUD's Final Rule directly contravenes RESPA's plain language, which specifically contemplates bona fide homebuilder-affiliate incentives. HUD's Final Rule does not simply violate the plain language of RESPA, but transforms affiliated business arrangements that have been legal for the last 25 years into criminal conduct. Indeed, just a few months ago, HUD's stated policy was that incentives offered by homebuilders were fully compliant with RESPA, as long as the incentives were bona fide and the relationship was disclosed.

Further, even accepting HUD's faulty premise that it can criminalize the offering of incentives under RESPA's prohibition against "required uses," HUD was nonetheless required to demonstrate during the rulemaking process that, in fact, the incentives offered by homebuilders resulted in a situation where the homebuyer was "required" to use the builders' affiliate. HUD failed to make any such demonstration. As a result, its revised regulation constitutes an unsupportable reversal of 16 years of stated policy, based on a record completely devoid of any reasoned basis. Indeed, during the comment period, the Federal Trade Commission ("FTC"), the agency charged with responsibility for enforcement of antitrust and consumer protection laws, requested that HUD not implement its proposed rule because of the detrimental impact it would

have on consumers. HUD ignored the FTC's comments, just as it ignored numerous other comments opposing its proposed "required use" rule.

With the implementation date looming before them, the Homebuilders and the Affiliated Companies now face an ominous threat to their businesses. The affiliated and joint business models that they built in reliance on RESPA's plain language will become obsolete. Stripped of their ability to participate in incentive programs – while settlement service providers such as mortgage brokers and realtors remain free to utilize incentives to encourage consumers to use their affiliated companies – the Affiliated Companies will suffer a substantial loss of business, resulting in severe job losses and threatening their continued viability. Consumers will also suffer from the reduced pool of options that will be available to them when choosing settlement service providers in connection with a home purchase.

The irreparable harm that the Homebuilders and the Affiliated Companies will suffer is actual and concrete and, more importantly, is precisely the type of harm that the preliminary injunction mechanism addresses and prevents. Because HUD cannot justify the legality of the Final Rule, and because the irreparable harm to the Homebuilders and the Affiliated Companies, their employees, and the public is so compelling, Plaintiffs request this temporary relief to prevent the Final Rule from going into effect until their claim can be heard. In enjoining the Final Rule, the Court will simply be preserving the status quo until this matter is decided on the merits. That status quo is the continuation of HUD's policy with respect to homebuilder incentives that has been in effect for more than 16 years – and one that every court that has reviewed it has found permissible under RESPA. To allow HUD to enforce its Final Rule, before the Homebuilders and Affiliated Companies have had a full and fair opportunity to

challenge it on the merits, will leave the Homebuilders with, at most, a Pyrrhic victory because

the Affiliated Companies cannot survive even the temporary implementation of the Final Rule.

## BACKGROUND

## I.   STATUTORY AND REGULATORY BACKGROUND

RESPA Section 8 prohibits kickbacks and unearned fees in connection with any real

estate settlement service involving a federally related mortgage loan.  12 U.S.C. § 2607(a)-(b).

In 1983, Congress added Section 8(c) to RESPA, to address the effect of Sections 8(a) and (b) on

referrals between related parties, including affiliated business arrangements.[2]

Section 8(c) explicitly limits the breadth of Sections 8(a) and (b), stating:

> ***Nothing in this section shall be construed as prohibiting*** . . . (4) affiliated
> business arrangements so long as (A) a disclosure is made of the existence of such
> arrangement to the person being referred and, in connection with such referral,
> such person is provided a written estimate of the charge or range of charges
> generally made by the provider to which the person is referred . . . (B) *such*
> *person is not required to use any particular provider of settlement services*, and
> (C) the only thing of value that is received from the arrangement, other than the
> payments permitted under this subsection, is a return on the ownership interest or
> franchise interest.

*Id.* § 2607(c) (emphasis added).

In 1992, HUD promulgated regulations setting forth guidelines for the affiliated-

business-arrangement exemption.  57 Fed. Reg. 49,600, 49,608, 49,612-13.  Although the

regulations have been amended since that time, their substance has remained the same.  *Compare*

*id. with* 24 C.F.R. §§ 3500.2, 3500.15.  HUD's regulations on affiliated business arrangements

---

[2]  When first enacted, RESPA 8(c)(4) referred to "controlled business arrangements."  Pub. L.
No. 98-181, § 461(b)(3).  Congress subsequently amended Section 8(c) in 1996.  Pub. L. No.
104-208, § 2103(c), (d).  The amendment changed the term "controlled business arrangements"
to "affiliated business arrangements" and revised the disclosure requirement for a person being
referred to an affiliated business.  *Id.*  Otherwise, the current version of 8(c) as it pertains to
affiliated business arrangements – and, more specifically the "not required to use" prohibition –
has not changed since its enactment.

involve two provisions.  The first elaborates on RESPA's requirement that a customer "is not required to use any particular provider of settlement services;" the regulation in its current form proscribes: "No person making a referral *has required* (*as defined in section 3500.2, 'required use'*) any person to use any particular provider of settlement services or business incident thereto . . . ." 24 C.F.R. § 3500.15(b)(2) (bold-italics emphasis added).  The second, cross-referenced section defines "required use" as follows:

> *Required use* means a situation in which a person must use a particular provider of a settlement service in order to have access to some distinct service or property, and the person will pay for the settlement service of the particular provider or will pay a charge attributable, in whole or in part, to the settlement service.  *However, the offering of a package (or combination of settlement services) or the offering of discounts or rebates to consumers for the purchase of multiple settlement services does not constitute a required use.*  Any package or discount must be optional to the purchaser.  The discount must be a true discount below the prices that are otherwise generally available, and must not be made up by higher costs elsewhere in the settlement process.

24 C.F.R. § 3500.2 (emphasis added).  (This provision, in effect until January 16, 2009, is referred to herein as "the Current Rule.")

## II.   HUD'S RULEMAKING PROCESS

On March 14, 2008, HUD published proposed amendments to, inter alia, Part 3500 of Regulation X, including the following revised definition of "required use":

> *Required use* means a situation in which a borrower's access to some distinct service, property, discount, rebate, or other economic incentive, or the borrower's ability to avoid an economic disincentive or penalty, is contingent upon the borrower using or failing to use a referred provider of settlement services.  However, the offering *by a settlement service provider* of an optional combination of *bona fide* settlement services to a borrower at a total price lower than the sum of the prices of the individual settlement services does not constitute a required use.

73 Fed. Reg. 14,030, 14,056 (Mar. 14, 2008) (bold-italics emphasis added).  The comment period for the Proposed Rule was initially set to expire on May 13, 2008, and was extended until

June 12, 2008.  73 Fed. Reg. at 68,205.  Mortgage industry groups and members of Congress

requested that HUD further extend the deadline for comment, but HUD rejected their request.

(Compl. ¶ 23; *id.* Exs. A-B (Congressional letters).)

HUD received approximately 12,000 comments, including comments from the FTC, the

NAHB, and various homebuilders and lenders.  73 Fed. Reg. at 68,205.  Despite the large

number of comments, HUD failed to analyze or address in any substantive manner the concerns

raised by the commenters about its decision to single out homebuilders as no longer eligible to

provide RESPA-compliant incentives to their customers who use their affiliated companies.

On November 17, 2008, HUD published the Final Rule, which, inter alia, includes the

following final definition of "required use" in section 3500.2:[3]

> *Required use* means a situation in which a person's access to some distinct
> service, property, discount, rebate, or other economic incentive, or the person's
> ability to avoid an economic disincentive or penalty, is contingent on the person
> using or failing to use a referred provider of settlement services.  In order to
> qualify for the affiliated business exemption under § 3500.15, *a settlement service*
> *provider may offer* a combination of bona fide settlement services at a total price
> (net of the value of the associated discount, rebate, or other economic incentive)
> lower than the sum of the market prices of the individual settlement services and
> will not be found to have required the use of the settlement service providers as
> long as:  (1) The use of any such combination is optional to the purchaser; and (2)
> the lower price for the combination is not made up by higher costs elsewhere in
> the settlement process.

72 Fed. Reg. 68,204, 68,239-40 (bold-italics emphasis added).

In short, the revised "required use" definition – for the first time since the affiliated-

business-arrangement exemption was adopted in 1983 – limits the use of incentives to settlement

service providers only.  The effect of this revision is to disqualify the Homebuilders (and other

providers of services other than settlement services) from offering incentives plainly

---

[3] Although the Final Rule represents a partial revision of the Proposed Rule, the substance of the
restriction on the offering of incentives to settlement service providers did not change following
the comment period.

contemplated and permitted by RESPA's affiliated-business-arrangement exemption. Indeed,

RESPA explicitly prohibits *any restrictions* on affiliated business arrangements except those

contained in the statute itself. 12 U.S.C. § 2607(c) ("Nothing in this section shall be construed as

prohibiting . . .") Although settlement service providers – including title companies, realtors,

and mortgage brokers – will continue to be able to offer incentives to their customers who use

their affiliated entities, the revised regulation targets non-settlement service providers, the largest

group of which is homebuilders.

## III.   FACTUAL BACKGROUND

Each of the Homebuilders is affiliated with or participates in a joint venture with a

mortgage lender and/or title company. In each case, the Homebuilder, in compliance with both

RESPA and Current Rule, offers discounts or incentives to prospective homebuyers who choose

to use the Homebuilder's Affiliated Mortgage Lender to finance their purchase or its Affiliated

Title Company to close the transaction.[4] The Homebuilders made the substantial investments

necessary to open and operate the Affiliated Companies in reliance on Congress' express

guidance in RESPA § 8(c) that these arrangements – and the incentives the entities might offer

their mutual customers – were lawful, subject only to certain restrictions contained in the statute.

(*See, e.g.,* Exs. A ¶ 12; B ¶¶ 13, 18; C ¶ 12; D ¶ 7.)

Homebuilders value the efficiency inserted into the closing process when homebuyers

use the Affiliated Companies. In these transactions, the Homebuilders' costs are lower than

when outside lenders and title companies are used. Specifically, because the Affiliated

---

[4]   *See, e.g.,* Declaration of NVR, Inc. and NVR Mortgage Finance, Inc. ("NVRM") (attached hereto at Exhibit A) ¶ 8; Declaration of Randall C. Present, President, DHI Mortgage Company Ltd. ("DHIM") and DHI Title of Texas ("DHIT") (attached hereto at Exhibit B) ¶ 9; Declaration of Debra W. Still, President of Pulte Mortgage LLC ("PMLLC") (attached hereto at Exhibit C) ¶ 8; Declaration of Kevin Gillespie, President of CTX Mortgage Company, LLC ("CTX") (attached hereto at Exhibit D) ¶ 8.

Companies have a shared interest with the Homebuilders in smooth transactions and timely closings, the Homebuilders do not need to provide as much oversight and coordination, resulting in less staff time with respect to these transactions.  Furthermore, the Homebuilders' costs are reduced when homebuyers use the Affiliated Companies rather than outside vendors, because the companies are able to streamline their administrative expenses.  (*See, e.g.,* Exs. A ¶¶ 14-17; B ¶¶ 13, 20; C ¶¶ 13, 15 ; D ¶¶ 12, 15.)  Most importantly, Homebuilders' transactions involving the Affiliated Companies close on time more frequently than transactions involving non-affiliates.  Homes that do not sell on time are financial liabilities, which tie up the Homebuilders' credit lines and preclude them from making the additional investments in building that are vital to the survival of their businesses.  (*See, e.g.,* Exs. A ¶ 18; B ¶ 13; C ¶ 18 ; D ¶ 12.)

The Homebuilders share with their customers the efficiencies enjoyed when the Affiliated Companies are used.  Specifically, the consumer benefits from cost-savings (from both the value of the incentive and the savings the streamlined administration process brings), the convenience of dealing with affiliated entities, the ease of the streamlined process, and timely closings.  (*See, e.g.,* Exs. A ¶¶ 14, 17; B ¶¶ 21-22; C ¶¶ 15-18 ; D ¶¶ 15-16, 19.)

## LEGAL STANDARD

A preliminary injunction should be granted where a plaintiff demonstrates the following elements:  (1) the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied; (2) the likelihood of harm to the defendant if the requested relief is granted; (3) the likelihood that the plaintiff will succeed on the merits; and (4) the public interest.  *East Tenn. Natural Gas Co. v. Sage*, 361 F.3d 808, 828 (4th Cir. 2004) (citing *Blackwelder Furniture Co. of Statesville, Inc. v. Seilig Mfg. Co., Inc.*, 550 F.2d 189 (4th Cir. 1977)).

"The irreparable harm to the plaintiff and to the defendant are the two most important factors." *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991). If the plaintiff has made "a clear showing" of irreparable harm if the injunction is denied, "the *next* step then for the court to take is to balance the likelihood of irreparable harm to the plaintiff …against the likelihood of harm to the defendant . . . ." *Id. at* 812 (internal quotations omitted). If the balance of hardships "tips decidedly in favor of the plaintiff," then an injunction will issue if "'the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation.'" *Rum Creek Coal Sales, Inc. v. Caperton*, 926 F.2d 353, 359 (4th Cir. 1991) (quoting *Blackwelder*, 550 F.2d at 195) (internal quotations omitted). Only after the Court has performed the balancing of the hardships should it proceed to the consideration of success on the merits. *Ciena Corp. v. Jarrard*, 203 F.3d 312, 322-23 (4th Cir. 2000).[5]

## ARGUMENT

### I.   PLAINTIFFS WILL SUFFER IRREPARABLE INJURY IF THE FINAL RULE BECOMES EFFECTIVE ON JANUARY 16, 2009

The Homebuilders and the Affiliated Companies will suffer irreparable harm if the Final Rule goes into effect. The rule will destroy their affiliated joint business models, which were created in strict accordance with RESPA. HUD's constriction of the statutory language will cause the Affiliated Companies to lose customers, which, in turn, will require them to terminate a large portion of their work force and will threaten their continued viability.

---

[5]   The strict rules of evidence do not apply to a hearing on a motion for a preliminary injunction. Because "[t]he purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held," and "given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than a trial on the merits." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). In short, a party "is not required to prove his case in full at a preliminary-injunction hearing." *Id.*

"[W]hen the failure to grant preliminary relief creates the possibility of permanent loss of customers to a competitor or the loss of goodwill, the irreparable injury prong is satisfied." *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 552 (4th Cir. 1994) (citing *Merrill Lynch, Pierce, Fenner and Smith, Inc. v. Bradley*, 756 F.2d 1048, 1055 (4th Cir. 1985)).[6] Although monetary damages do not normally constitute irreparable harm, where damages cannot be later collected because defendant enjoys sovereign immunity, damages do become irreparable. *See United States v. New York*, 708 F. 2d 92, 93 (2d Cir. 1983) (per curium) (Eleventh Amendment sovereign immunity claim); *Blum v. Schlegel*, 830 F. Supp. 712, 724 (W.D.N.Y. 1993) (same); *cf. Rum Creek Coal Sales, Inc.*, 926 F.2d at 361 ("narrowing of remedies available under § 1983, limits the Company's ability to obtain damages").[7]

There are two significant types of irreparable harm that Plaintiffs will face if the Final Rule goes into effect on January 16, 2009. First, Plaintiffs will have to abandon in toto the joint business model that they built in reliance on their rights under RESPA. Second, the Affiliated

---

[6] *See also Tri-State Generation & Transmission Ass'n, Inc. v. Shoshone River Power, Inc.*, 805 F.2d 351, 356 (10th Cir. 1986) (threat to trade or business viability may constitute irreparable harm); *Sprint Corp. v. DeAngelo*, 12 F. Supp. 2d 1188, 1194 (D. Kan. 1998) (same); *United Retail Inc. v. Main Street Mall Corp.*, 903 F. Supp. 12, 14 (S.D.N.Y. 1995) (discussing whether a company's solvency would be jeopardized or the company would require substantial changes in its operations); *Cho v. Itco, Inc.*, 782 F. Supp. 1183, 1185 (E.D. Tex. 1991) (threat that party will "be driven out of business"); *Galvin v. New York Racing Ass'n*, 70 F. Supp. 2d 163, 169-70 (E.D.N.Y. 1998) ("the loss of business need not be total, so long as it is so great as to seriously compromise the company's ability to continue in its current form.").

[7] Under the APA, Congress "waived sovereign immunity in actions seeking relief other than money damages." *See Am. Civil Liberties Union v. National Sec. Agency*, 493 F.3d 644, 678 n.36 (6th Cir. 2007) (citing *Presbyterian Church v. United States*, 870 F.2d 518, 524 (9th Cir. 1989)). Thus, in this case, Plaintiffs will incur irreparable harm if a preliminary injunction is denied because they are not entitled to seek their out-of-pocket restructuring costs. *Waste Mgmt. Holdings, Inc. v. Gilmore*, 64 F. Supp. 2d 523, 531 (E.D. Va. 1999) ("[W]here the only possible remedy ultimately available to plaintiff is injunctive relief, the requisite showing will be less strict than in other instances where future monetary remedies are available." (internal quotations omitted)).

Companies will suffer extreme downsizing and job loss, threatening the viability of these entities. Behind both types of irreparable harm lies a reality that HUD has ignored about the nature of the Affiliated Companies and the nature of the Homebuilders' incentive programs for use of the Affiliated Companies ("Homebuilder-Affiliate incentives"). Specifically, HUD has refused to acknowledge the history of these companies and the fact that, for 16 years, HUD has endorsed their business models, which rely heavily on incentive programs. (*See, e.g.,* Exs. A ¶¶ 7-8; B ¶ 9; C ¶ 8 ; D ¶¶ 7-8.) An examination of these incentive programs provides an important foundation for understanding both types of harm that the Final Rule will inflict on the Homebuilders and Affiliated Companies. Two basic types of incentives are relevant to this analysis. The first involves builder-forward commitments and the second involves other forms of discounts provided directly to the homebuyer by the builder.

Homebuilders purchase forward commitments from lenders to ensure that their homebuyers can secure favorable financing to make their home purchases. In exchange for a fee, homebuilders frequently buy down the interest rates in the commitments to present attractive financing to their customers. The homebuilder forward commitment fee is non-refundable, even if the homebuilder's customers do not exhaust the full commitment amount. Because commitments are expensive and require that a significant number of a homebuilder's customers use the lender, homebuilders typically purchase commitments from a single lender. The ability to offer financing with bought-down rates is important for a homebuilder to be competitive in the industry. (*See, e.g.,* Exs. A ¶ 9; B ¶¶ 10-11; C ¶ 9 ; D ¶¶ 9-10.)

HUD has stated – and it appears evident from the language of the Final Rule – that builder-forward commitments offered to affiliated mortgage lenders violate RESPA because they are now deemed to be a "required use." Likewise, the second category of incentives – the

offering of incentives (like a closing-cost credit or a builder upgrade) by homebuilders directly to homebuyers if they use the homebuilders' affiliates – without doubt violates the Final Rule. HUD's newfound prohibition of Homebuilder-Affiliate incentives will literally destroy the business model that the Homebuilders and the Affiliated Companies have created. (*See, e.g.*, Exs. A ¶¶ 21, 24-26; B ¶¶ 11, 31; C ¶¶ 9, 23 (the Final Rule "would terminate PMLLC's ability to help home purchasers obtain competitively priced financing, through builder commitments and other incentives, to buy homes build by Pulte Homes"); D ¶¶ 10, 21.)

The Affiliated Mortgage Lenders operate for the specific purpose of providing loans to the customers of their respective affiliated Homebuilders. The Affiliated Mortgage Lenders were not designed to compete on the open market, nor do they have sufficient operating budgets to advertise in the manner that unaffiliated mortgage lenders do. (*See, e.g.*, Exs. A ¶ 11; C ¶¶ 6,11; D ¶ 13.) The Affiliated Mortgage Lenders are experts in transactions unique with their Homebuilders, and they know exactly what is required in all steps of those transactions, leading to smooth and timely closings. Notably, a much higher percentage of transactions involving the Affiliated Companies close on time than those involving outside lenders and title companies. The Homebuilders and Affiliated Companies share a common goal, have resources for data sharing, and are intimately familiar with each other's processes. The results are that the closing process is more streamlined and it takes far fewer Homebuilder resources to oversee these transactions. (*See, e.g.*, Exs. A ¶¶ 15-18, 20; B ¶¶ 13, 20-22; C ¶¶ 15-18 ; D ¶¶ 12, 15.)

The Homebuilders offer incentives to their customers to encourage them to use the Affiliated Companies, but by no means are the customers *required* to use the services of the Affiliated Companies. However, given the incentives – be it a bought-down rate through a builder-forward commitment, a closing-cost incentive, or a "bonus room" in the house –

customers are frequently persuaded to use the Affiliated Company and thereby receive the best bargain. (*See, e.g.,* Exs. A ¶¶ 8; B ¶ 9; C ¶ 8; D ¶ 8.)

The Affiliated Mortgage Lenders set their pricing based on the secondary market and, once stripped of their ability to participate in incentive programs, will not be able to capture the same amount of business that they currently do. They will not be able to compete with rates that are bought down by builders in forward commitments with non-affiliated lenders, nor will they be able to "make up" for the lack of incentives by simply lowering their rates to below-market pricing. They must remain profitable in order to maintain their warehouse lending lines of credit, which provide the funds necessary to make loans. (*See, e.g.,* Exs. B ¶¶ 11, 14; C ¶¶ 9, 26 ; D ¶¶ 10, 13.) Stripped of their ability to use incentives – the tools that they were designed to use – the Homebuilder-Affiliate business model will fail.

The resulting harm to the businesses includes, first, the forced abandonment by the Homebuilders of the business model they built with the Affiliated Companies in reliance on RESPA. That loss includes the incentive-based structure of the companies, which will be deemed obsolete and illegal if the Final Rule becomes effective, and the lost benefits from the time, effort, and money that went into establishing that structure. Second, the Affiliated Companies will endure an immediate and substantial loss of jobs – thousands of jobs – because they simply will not have enough customers to support their businesses. Consequently, the Affiliated Companies will be forced to terminate a large portion of their work force. They cannot recapture those employees and the expertise they provided; those resources will simply be lost. Ultimately, it appears inevitable that the Homebuilders will have no choice but to divest

themselves of their affiliates. This type of threat to the viability of the Affiliated Companies constitutes irreparable harm.[8]

Third, the Homebuilders will suffer a substantial loss of liquidity and certainty of cash flow. When operating with the Affiliated Mortgage Lenders, the Homebuilders enjoy a higher degree of certainty, success, and timeliness in their transactions. When the Final Rule becomes effective, the Homebuilders' customers will turn to outside financing, compromising the Homebuilders' ability to schedule and execute housing starts because of uncertainty regarding their cash flow. (*See, e.g.*, Ex. B. ¶ 17.)

## II.     THE INJURY THAT THE FINAL RULE WILL CAUSE PLAINTIFFS OUTWEIGHS ANY HARM THAT HUD MIGHT SUFFER

The injury to Plaintiffs if the Final Rule becomes effective on January 16, 2009, is substantial – involving a forced abandoning of the Homebuilder-Affiliate joint business model, substantial job losses in the Affiliated Companies, and the threatened viability of those companies. The gravity of this harm to the Plaintiffs and their employees cannot be overstated.

On the other hand, if the Final Rule is stayed, HUD will incur *no harm*. In fact, most of the requirements contained in the remainder of the Final Rule, which pertain to other RESPA revisions, do not become effective for another year. 73 Fed. Reg. at 68,204. If implementation of the Final Rule is enjoined, the Current Rule – which is RESPA-compliant – will remain in effect. The Current Rule has been effective for the past 16 years and can easily bridge any gap while the Court considers the merits of this case. In short, HUD has no interest to

---

[8]   *See, e.g.,* Exs. A ¶¶ 21-26 ("enforcement of the Final Rule will cripple NVRM's ability to operate"); B ¶¶ 11, 14-15, 18, 27-31 (the Final Rule will "jeopardize [DHIM and DHIT's status as a residential mortgage lender and title agency"); C ¶¶ 9, 25-30 ("Because of the sever disruption to its business operations, PMLLC will be forced to lay off a number of highly trained and specialized employees, including many who have a decade or more of tenure"); D ¶¶ 10, 13, 21-24 (describing the "severe economic disadvantage" that CTX will face once Centex can no longer offer incentives).

counterbalance the gravity of terminating a business model, sacrificing thousands of jobs, and putting the viability of the Affiliated Companies at risk.

## III.   PLAINTIFFS HAVE A SUBSTANTIAL LIKELIHOOD OF SUCEEDING ON THE MERITS OF THEIR CLAIM

Plaintiffs are likely to prevail on their APA claim because the Final Rule is both (a) contrary to law and (b) arbitrary and capricious.  5 U.S.C. § 706(2)(c).  Specifically, the Final Rule unlawfully contravenes the plain language of RESPA, which contains only a narrow limiting provision on the otherwise wholly permissible affiliated business arrangements.  The Final Rule is also arbitrary and capricious because it overturns 16 years of HUD regulation and policy, on a scant record and without any analysis or reasoned consideration of comments HUD received during the rule-making process.

### A.   The Final Rule Contravenes the Plain Language of RESPA

It is axiomatic that if "Congress has directly spoken to the precise question at issue," an administrative agency "lacks authority to enact regulations inconsistent with the congressional directive." *United States  v. Baer*, 324 F.3d 282, 286 (4th Cir. 2003) (*citing Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984).   The Secretary of HUD has the authority to interpret and promulgate regulations pursuant to the National Housing Act.  12 U.S.C. § 1701c(a).  However, a regulation that exceeds HUD's statutory jurisdiction, authority, and right is invalid under the APA.  5 U.S.C. § 706(2)(c).

Section 8(c) of RESPA refers to the prohibition against kickbacks and referral fees in Sections 8(a) and 8(b), and explicitly prohibits any limitation on affiliated business arrangements other than the three requirements set forth in the law.  Specifically, Section 8(c) begins with expansive language indicating Congress' intent to favor affiliated business arrangements in virtually all circumstances:  "***Nothing in this section shall be construed as prohibiting*** . . . (4)

affiliated business arrangements," as long as a proper disclosure is given, the person "is not required to use" a particular settlement service provider, and nothing of value is received other than payments permitted under this section. 12 U.S.C. § 2607(c)(4). There is no ambiguity in the phrase "is not required to use," and it is undisputed that, where Congress has not defined a term, the plain meaning of those words control. *Bread Political Action Comm. v. Fed. Election Comm'n.*, 455 U.S. 577, 581 (1982). Where the plain meaning is obvious, there is no need to turn to legislative history or rely on the agency for an interpretation of the statute. *See Chevron U.S.A., Inc.*, 467 U.S. at 842 ("If the intent of Congress is clear, that is the end of the matter.").

Indeed, for the past 16 years, HUD has understood the plain meaning of "is not required to use," as it has defined "required use" in Regulation X. In the Current Rule, HUD explains that "required use" describes a situation where a person "*must use*" a particular settlement service provider "in order to have access to some distinct service or property, and the person will pay for the settlement service of the particular provider or will pay a charge attributable, in whole or in part, to the settlement service." 24 C.F.R. § 3500.2. Importantly, the Current Rule continues: "*However, the offering of a package (or combination of settlement services) or the offering of discounts or rebates to consumers for the purchase of multiple settlement services does not constitute a required use.* Any package or discount must be optional to the purchaser. The discount must be a true discount below the prices that are otherwise generally available, and must not be made up by higher costs elsewhere in the settlement process." *Id.* (emphasis added).

In other words, if a person has to use – and pay for the services provided by – a particular settlement service provider in order to receive some other service or property, the use is "required" under the Current Rule. The Current Rule is a reasonable statement of the plain meaning of RESPA 8(c)'s language "is not required to use," because the regulation draws a line

between forcing (or coercing) a person to use a particular provider and giving them the option of using a particular provider in exchange for a bona fide discount.

Now, however, in the Final Rule, HUD endeavors to broaden the phrase "is not required to use" to render illegal *any discount* – bona fide or not – offered by a non-settlement service provider (i.e., a homebuilder) for the use of its affiliated company. Stated simply, HUD's Final Rule includes an additional definition of "required use," to include *any incentive offered by a homebuilder for the use of its affiliated settlement service company* – regardless of whether the consumer is actually "required" to use that company. HUD's attempt to write an exclusion of all homebuilder-affiliate discounts into RESPA 8(c) imposes an additional, unlawful restriction on an entire category of institutions and, in doing so, explicitly contravenes RESPA's proscription that no qualifying criteria be imposed on affiliated business arrangement under Section 8(c)(4) other than those contained therein.

In short, the Final Rule's excessive prohibition against options and incentives cannot be squared with RESPA's plain language that prohibits only "required" uses. "Congress has spoken directly to the precise question at issue, 'that is the end of the matter,' and no amount of *Chevron* step-two posturing on the part of the agency" can override what Congress wrote and intended. *Fernandez v. Kiesler*, 502 F.3d 337, 347 (4th Cir. 2007), *cert. denied*, 129 S. Ct. 65 (2008) (quoting *Chevron*, 467 U.S. at 842 (1984)). Because the Final Rule creates new law that is contrary to the plain language of RESPA, it is a violation of the APA and must be set aside. 5 U.S.C. § 706(2)(c). However, even if the Final Rule did not run afoul of RESPA – and it does – the Court should strike the Rule as arbitrary and capricious.

### B.   The Final Rule is Arbitrary and Capricious

Under the APA, the Court must also hold unlawful and set aside agency action that is arbitrary and capricious. 5 U.S.C. § 706(2)(A). Although the scope of review under the arbitrary and capricious standard is narrow, a reviewing court must ensure the agency "has examined the relevant data and articulated a satisfactory explanation for its action, including a rational connection between the facts found and the choice made." *aaiPharma, Inc. v. Thompson*, 296 F.3d 227, 242 (4th Cir. 2002) (quoting *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)) (alterations and internal quotations omitted). Courts will overrule an agency's judgment if the agency "failed to consider relevant factors and committed a clear error of judgment." *The Md. Dep't of Health and Mental Hygiene v. Centers for Medicare and Medicaid Servs.*, 542 F.3d 424, 427-28 (4th Cir. 2008) (internal quotations omitted).

An agency decision is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Fisherman's Dock Co-Op, Inc. v. Brown*, 75 F.3d 164, 172 (4th Cir. 1996) (quoting *State Farm*, 463 U.S. at 43). It is the agency's responsibility, not the court's, to explain the agency's decision, and courts must only rely on the reasons the agency has provided. *State Farm*, 463 U.S. at 50. Although a court may "'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned,'" a Court "cannot infer an agency's reasoning from mere silence or where the agency failed to address significant objections and alternative proposals. *HLI Lordship Indus. v. Comm. for Purchase from the Blind and Other Severely*

*Handicapped*, 791 F.2d 1136, 1140 (4th Cir. 1986) (*quoting State Farm*, 463 U.S. at 43); *Beno v.*

*Shalala*, 30 F.3d 1057, 1073 (9th Cir. 1994) (*quoting State Farm*, 463 U.S. at 43, 57). Rather,

"'an agency's action must be upheld, if at all, on the basis articulated by the agency itself.'"

Beno, 30 F.3d at 1073-74 (*quoting* State *Farm*, 463 U.S. at 50). While formal findings are not

required, the record must be sufficient to support the agency action, show that the agency has

considered the relevant factors, and enable the court to review the agency's decision. *Florida*

*Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985).

HUD's Final Rule is arbitrary and capricious for three independent reasons: (1) it

overturns 16 years of HUD regulation and policy, without recognizing or explaining its abrupt

reversal; (2) HUD failed to consider and analyze the relevant and salient comments it received

on the Proposed Rule; and (3) the purported bases to which HUD did refer in promulgating the

Final Rule are unsupported by either reasoned analysis or independent evidence. Each of these

reasons provides an independent basis for setting aside the Final Rule.

### 1.   HUD's Final Rule Overturns 16 Years of its Own Regulation and Policy, Without Any Explanation of the Basis for that Reversal

The Final Rule should be set aside because it represents an unreasoned departure from

HUD's prior regulation and policy. In promulgating the Final Rule, HUD reversed 16 years of

its own rules and guidance, without acknowledging or explaining that it was making a 180-

degree change in course. Of course, an agency "is entitled to change its course when its view of

what is in the public's interest changes. However, 'an agency changing its course must supply *a*

*reasoned analysis indicating that prior policies and standards are being deliberately changed,*

not casually ignored, and if an agency glosses over or swerves from prior precedents without

discussion it may cross the line from the tolerably terse to the intolerably mute.'" *Nw. Envt'l*

*Def. Center v. Bonneville Power Admin.*, 477 F.3d 668, 687-88 (9th Cir. 2007) (quoting *Greater*

*Boston Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C. Cir. 1970)) (emphasis added).[9]  "If an

agency fails to comply with that obligation, the new rule is 'arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law' and is invalid under § 706(2)(A) of the

APA." *Se. Alaska Conservation Council v. United States Army Corp. of Eng'rs*, 486 F.3d 638,

653 (9th Cir. 2006) (*quoting State Farm*, 463 U.S. at 41); *see also ANR Pipeline Co. v. FERC*, 71

F.3d 897, 901 (D.C. Cir. 1995).

 Moreover, in reviewing HUD's actions, the court must look to HUD's own reasoning in

making its decision to implement the Final Rule, and not to other reasons for its reversal that

HUD's counsel might marshal after the fact.  In other words, the court "may not accept

[counsel's] post hoc rationalizations" and "'may not supply a reasoned basis for the agency's

action that the agency itself has not given.'"  *Nw. Envt'l Def. Center*, 477 F.3d at 688 (quoting

*Bowman Transp., Inc. v. Ark.-Best Freight Sys.*, 419 U.S. 281, 285-86 (1974)).

 Applying these considerations to the facts at hand, it is apparent that, since at least 1992

when HUD promulgated regulations implementing RESPA's affiliated-business-arrangement

exemption, HUD approved of incentives offered under Section 8(c)(4) – regardless of whether

they were offered by a settlement service provider or a non-settlement service provider.  Indeed,

the Current Rule, substantively the same since it was promulgated 16 years ago, contemplates

bona fide, optional incentives for the use of an affiliated company, regardless of who offers those

---

[9]  Indeed, Courts have recognized that an agency has a higher burden where, as here, it changes
longstanding policy. *See, e.g., Shays v. FEC*, 511 F. Supp. 2d 19, 25 (D.D.C. 2007). "'Whatever
the ground for the [agency's] departure from prior norms, ... it must be clearly set forth so that
the reviewing court may understand the basis of the agency's action and so may judge the
consistency of that action with the agency's mandate.'" *Nw. Envt'l Def. Ctr.*, 477 F.3d at 688
(quoting *Atchison, Topeka & Santa Fe Ry. v. Wichita Bd. of Trade*, 412 U.S. 800, 808 (1973)
(plurality opinion)); *accord Int'l Union, United Auto., Aerospace & Agric. Implement Workers of
Am. v. NLRB*, 802 F.2d 969, 974 (7th Cir. 1986) (stating it is a "general principle of
administrative law" that "an administrative agency is not allowed to change direction without
some explanation of what it is doing and why.").

incentives. 24 C.F.R. § 3500.2. The Current Rule comports with the statute, which does not limit the category of entities that may take advantage of the exemption.

Moreover, until now, HUD has taken the unambiguous position that non-settlement service providers – and, specifically, homebuilders – may offer incentives under RESPA Section 8(c)(4). Until very recently, HUD's website explicitly approved of these arrangements, in the following, taken from a series of frequently asked questions and answers designed to help consumers "understand the law" and their rights under RESPA:

> Question: A builder is offering to pay my closing costs or give me an upgrade package only if I agree to use his mortgage company. Is this legal under RESPA?

> Answer: Yes. While a builder cannot require you to use a mortgage company with whom he is affiliated, a builder is allowed to offer you a discount if you use a specific company. Under RESPA, the builder cannot charge you more for the home if you do not use his affiliated mortgage company.

HUD Office of Housing, *Frequently Asked Questions About RESPA, at* http://www.hud.gov/ offices/hsg/sfh/res/resconsu.cfm (last visited Oct. 6, 2008).

The Final Rule represents a complete failure of HUD's obligation to set forth clearly its grounds for reversing its policy and guidance on affiliated business arrangements. *Nw. Envl't Def. Ctr.* , 477 F.3d at 688. Indeed, HUD's comments in its Impact Analysis for the Final Rule[10] reflect a lack of understanding about the effect of the Final Rule. HUD states:

> The change to the definition of "required use" will not eliminate the ability *of anyone to offer legitimate consumer discounts*. HUD does not interpret RESPA as preventing a settlement service provider or anyone else from offering a discount or other thing of value directly to the consumer. The only limitation *is on tying such a discount* to the use of a particular settlement service provider.

Impact Analysis for Final Rule at 3-88 (emphasis added).

---

[10]   HUD, Regulatory Impact Analysis and Initial Regulatory Flexibility Analysis FR-5180-F-02, *available at* http://www.hud.gov/utilities/intercept.cfm?/offices/hsg/sfh/res/200803/ 5180RIA.pdf ("Impact Analysis for the Final Rule").

Of course, the Final Rule does "eliminate the ability"– explicitly – of homebuilders to offer "legitimate consumer discounts" for use of their affiliates.  Moreover, HUD's statement that the limitation is only "on tying" is misleading – the Final Rule does not limit "tying"[11] for everyone, just for homebuilders (and other non-settlement service providers).  And, with respect to homebuilders, the Final Rule is not a limitation, it is a prohibition.  Whether HUD's misrepresentations about the effect of the Final Rule were intentional or due to a failure to understand the Rule's ramifications, they elucidate the fact that HUD promulgated the Final Rule without providing, as it must, a reasoned analysis for reversing its longstanding policy that homebuilders have the same rights under Section 8(c)(4) as anyone else.

### 2.  *In Promulgating the Final Rule, HUD Failed to Consider and Analyze the Comments Submitted*

HUD shirked its duty under the APA and ignored relevant and substantive comments from Plaintiffs.  It is well established that an agency issuing regulations has an obligation to respond in a reasoned manner to comments it received, to explain how it resolved significant issues raised by the comments, and to show how it arrived at the final rule.  *See, e.g., State Farm*, 463 U.S. at 43; *Alvarado Community Hosp. v. Shalala*, 155 F.3d 1115, 1122 (9th Cir. 1998); *amended by*, 166 F.3d 950 (9th Cir. 1999); *HLI Lordship Indus., Inc. v. Comm. for Purchase from the Blind & Other Severely Handicapped*, 791 F.2d 1136, 1140-41 (4th Cir. 1986); *City of Brookings Mun. Telephone Co. v. FCC*, 822 F.2d 1153, 1169 (D.C. Cir. 1987) (invalidating action by the FCC for "failure to even consider" a commenter's proposal).

---

[11]  Presumably, by "tying," HUD meant "conditioning."  "Tying" is a term of art in antitrust law that has no applicability here.  *See, e.g., Beyer v. Heritage Realty, Inc.*, 251 F.3d 1155, 1157 (7th Cir. 2001) ("RESPA has nothing to do with antitrust or 'restraint of trade' in general, or price fixing in particular."); *Capell v. Pulte Mortgage L.L.C.*, No. 07-1901,2007 WL 3342389, at *8 (E.D. Pa. Nov. 7, 2007) ("The legal realms [of antitrust and RESPA] are too distant from one another.").

The comments HUD received from Plaintiffs detailed how Homebuilder-Affiliate incentives provide many benefits to homebuyers, informed HUD what the effects would be if the proposed rule went into effect, and suggested other alternatives to accomplish HUD's goals. All were ignored by HUD. *See Beno v. Shalala*, 30 F.3d 1057, 1074-75 (9th Cir. 1994) (holding that the court "should not infer that an agency considered an issue merely because it was raised, where there is no indication that the agency or other proponents refuted the issue"). HUD's willful ignorance of the public's concerns renders its rulemaking arbitrary and capricious. As the D.C. Circuit explained, "[t]he APA guarantees the public an opportunity to comment on proposed rules. That opportunity is meaningless unless the agency responds to significant points made by the public." *Action on Smoking & Health v. CAB*, 699 F.2d 1209, 1217 (D.C. Cir. 1983) (internal quotations omitted).

### a. Comments Explaining The Current Rule's Benefits to Homebuyers

The commenters explained that, under the current system, homebuilders have lower per-loan operating costs when their customers use their affiliated settlement service providers, and that homebuilders pass these savings along to consumers. (Compl. Ex. C at 5-6, Ex. D at 5, 13; Ex. E at 10-12.) The commenters further explained that HUD's suggestion that homebuilders increase their prices to offset the offered incentives is unsupportable; the competitive nature of the market and the requirement that home prices be supported by an independent appraisal prevent such behavior. (*Id.* Ex. C at 5-6, Ex. E at 4-5.) The commenters included references to several independent economic studies, each demonstrating that affiliate lenders are cost competitive. (*Id.* Ex. D at 13.)

More than simply being good bargains for consumers, the commenters demonstrated that homebuilder affiliates also provide a wide array of other consumer benefits. These benefits

include the ease of "one-stop shopping," the convenience of a streamlined administrative process, and the ability to ensure a home sale closing occurs in a timely manner. (*Id.* Ex. C at 5, Ex. D at 4-13.) In fact, surveys routinely reveal how much consumers value the savings and simplicity of builder-affiliate transactions. (*Id.* Ex. D at 14.) Homebuilders rely on repeat business and referrals, and they tend to construct and sell homes in the same communities for many years; thus, homebuilders are committed to establishing and maintaining good relationships with their consumers. (*Id.* Ex. C at 4.) Perhaps most important to consumers, builder affiliates are able to close transactions where outside lenders have backed out or gone out of business. (Id. Ex. at 5.) In the fourth quarter of 2007 alone, one homebuilder provided evidence that it stepped in at the last minute 33% of the time that outside lenders were used because the outside lender closed its doors. (Id. Ex. D at 4-5, n.7.)

### b.    Comments Explaining the Effects of Final Rule

The commenters also warned HUD of the dangers inherent in the Final Rule. Homebuilders will divest themselves of their affiliated operations, shedding thousands of jobs. (*Id.* Ex. D at 8.) As a result, closings will be delayed as efficiencies are lost, and closing costs for consumers will increase. (*Id.*) Critically, "HUD's proposal would eliminate consumer choice. . . . HUD appears to believe that a consumer's choice . . . is based solely on cost. . . . [T]hat is clearly not the case. Various factors are weighed . . . including price, convenience, service and reputation . . . [T]he consumer is in the best position to determine what is best for the consumer – not HUD." (*Id.* Ex. E at 16.)

The above are but a small sample of the hundreds of pages of insightful, erudite comments that HUD received. HUD's failure to respond to those comments is a violation of its responsibility under the APA. 5 U.S.C §553 (c); *see also HLI Lordship Indus., Inc.*, 791 F.2d at

1140-41 (holding that the Committee violated the APA by failing "to articulate what major issues of policy were ventilated by the informal proceedings, despite the fact that [plaintiff and others] raised numerous objections relevant to [the] decision" (citations and internal quotations omitted)). Tellingly, HUD's Impact Analysis for the Final Rule substantively mirrors the Impact Analysis for the Proposed Rule. Although HUD itemizes certain comments it received from homebuilders and their affiliates, it includes no analysis, response, or justification for the Final Rule in light of those comments. This failure renders its rulemaking invalid.

> **c.    Comments Proposing Other Alternatives to the Proposed Rule**

Importantly, Plaintiffs and other commenters suggested various alternatives to HUD's Final Rule. Specifically, if HUD was concerned with the dollar amount of incentives, HUD could limit the amount of any such incentive and not disturb the infrastructure and efficiencies already in place. (*Id.* Ex. C at 8-9.) Similarly, if HUD was concerned about the consumer's ability to assess the value of non-financial mortgage incentives, HUD could simply require a disclosure of the approximate value of any such incentive. (*Id.*)

The fact that HUD failed to consider less restrictive – and RESPA compliant – alternatives to the Final Rule is indicative of the many flaws in its rulemaking process. *See Int'l Ladies' Garment Workers' Union v. Donovan*, 722 F.2d 795, 818 (D.C. Cir. 1983) (vacating agency's decision because the Secretary ignored various proposed alternatives aimed at accommodating the Secretary's concerns without completely rescinding longstanding restrictions); *Office of Commc'n of United Church of Christ v. FCC*, 707 F.2d 1413, 1440 (D.C. Cir. 1983).

### 3. *The Scant Rationale that HUD Did Provide Does Not Support the Final Rule*

The portion of the Final Rule regarding "required use" is also arbitrary and capricious because HUD's stated rationale does not support the prohibition on incentives offered by homebuilders. Although the Court "may 'uphold a decision of less than ideal clarity if the agency's path may be reasonably be discerned,'" *Beno*, 30 F.3d at 1073 (*quoting State Farm*, 463 U.S. at 43), the Court "cannot infer an agency's reasoning from mere silence or where the agency failed to address significant objections and alternative proposals. Rather, 'an agency's action must be upheld, if at all, on the basis articulated by the agency itself.'" *Beno*, 30 F.3d at 1073-74 (*quoting State Farm*, 463 U.S. at 50) (citations omitted). "Thus, while formal findings are not required, the record must be sufficient to support the agency action, show that the agency has considered the relevant factors, and enable the court to review the agency's decision." *Beno*, 30 F.3d at 1074; *see also Nat'l Wildlife Fed'n v. FERC*, 801 F.2d 1505, 1512 (9th Cir. 1986) (vacating and remanding where the agency "did not mention the extensive and uncontradicted evidence offered by petitioners" or explain its rejection of options proposed by the petitioners).

As a testament to HUD's failure to take into account the Comments it received, or to engage in a reasoned analysis of the issues before it, HUD's Impact Analysis for the Final Rule cites the same three arguments in support of the Rule from its Impact Analysis on the Proposed Rule, again without any substantiating evidence or other justification. Specifically, HUD cites the following three bases for the Final Rule: (a) assessing the value of a non-financial incentive "may pose challenges that inhibit effective shopping for loans and settlement services by consumers;" (b) "some builders may" raise their prices to make up for the incentive; and (c) the National Association of Mortgage Brokers ("NAMB") argues that builder incentives are anti-competitive. Impact Analysis for the Final Rule at 3-89. Tellingly, HUD neither presents any

27

evidence to support these three purported bases, nor does it provide a reasoned analysis for how any of these bases justify the Final Rule.

First, as to HUD's assertion that consumers "may" have difficulty assessing the value of a non-financial incentive, this argument is entirely speculative and assumes customer ignorance. The fact that "some" customers "may" be confused by one category of incentives does not warrant the elimination of *all* builder incentives offered for the use of builder affiliates. Indeed, a credit towards closing costs is an incentive that cannot possibly result in customer confusion. Moreover, HUD completely ignored the advice of the FTC when it advised that HUD reconsider the rule. The FTC – an agency charged with consumer protection – did not agree with HUD's concern about consumer confusion. Instead, the FTC opined that "it may actually be easier" for consumers to compare bundles of services than individual services. (Compl. Ex. B at 31-32.)

HUD's second assumption, that "some" homebuilders "may" make up for incentives by raising costs elsewhere, is likewise speculative and unsupported. HUD cites no evidence to demonstrate that this practice actually exists. Instead, HUD refuses to acknowledge the fact (although it was presented repeatedly in the Comments) that the sales price of all homes must be supported by independent appraisals. Most importantly, this activity – if it occurs – is prohibited by the Current Rule. Even HUD recognizes this fact:

> Another major argument against allowing builder discounts is that *some* builders *may* pay for the economic incentive by surreptitiously raising other charges beyond the market price. Such behavior *is a violation of the current rule*; discounts must be legitimate and not built into the price of the house or the cost of the loan. This is nonetheless *difficult to monitor and enforce*. Prohibiting builder discounts altogether is *more effective*.

Impact Analysis for Final Rule at 3-89 (emphasis added). HUD's candid admission that it is just easier to prohibit builder-affiliate incentives "altogether" is a compelling commentary on its rulemaking process. Regulatory ease simply cannot justify this type of overreaching.

Finally, HUD's argument – taken directly from the NAMB – that homebuilder incentives are anti-competitive is an unsupported assertion. Importantly, NAMB is not an independent, neutral source, but, rather, a group of mortgage brokers that compete with builder-affiliated mortgage lenders. By adopting the position of the NAMB on this matter, HUD neglected the purpose of RESPA – it is a consumer protection statute, not a market-protection statute.

HUD's stated rationale for its decision to adopt the Final Rule fails to establish a reasonable basis to uphold the agency's action. *Beno*, 30 F.3d at 1073-74. To the contrary, the stated bases demonstrate the arbitrary and capricious nature of the Final Rule.

## IV.    ENJOINING THE FINAL RULE IS IN THE PUBLIC INTEREST

Finally, a preliminary injunction enjoining the Final Rule is necessary to protect the public interest because its implementation (1) will eliminate customer choice and (2) will result in the loss of thousands of jobs.

First, the Final Rule will eliminate a consumer choice that would otherwise result in savings and an efficient, streamlined closing process. When a Homebuilder customer uses an Affiliated Company, the likelihood that the transaction will close on time increases substantially. This one-stop shopping is not only convenient, but also provides the customer with substantial monetary savings. Because the affiliated lender works closely with the builder, both the builder and the lender are able work more efficiently and reduce the expenses that they must pass on to the customer. Importantly, the presence of the Affiliated Companies results in a more competitive loan market, even for those borrowers who are not purchasing from a builder with an affiliated lender. If the Affiliated Companies are not allowed to operate as RESPA permits, the business model will fail, and the pool of available lenders and title agencies will likewise shrink, thereby further reducing competition.

Second, HUD's Final Rule will result in a substantial number of Plaintiffs' employees losing their jobs. In these tough financial times, the risk of unemployment is a significant factor in any consideration of the public interest. That is especially true where, as here, the loss of jobs for those employed in the mortgage industry has been particularly severe. If the Homebuilders are prohibited from using builder-affiliate incentives, then the Affiliated Companies will experience an immediate and overwhelming reduction in business, and such a sizable reduction in business will require a correspondingly prompt and substantial reduction in the lenders' work force.

## CONCLUSION

For all of the foregoing reasons, the Court should enter a preliminary injunction enjoining the Final Rule until the merits of the Complaint may be heard.

Dated: December 24, 2008                  Respectfully submitted,

_Michelle Hinchliffe Holmes_

Michelle Hinchliffe Holmes, Esq.,
Va. Bar No. 75004

Of Counsel:

Mitchel H. Kider, Esq. (*pro hac vice* application forthcoming)

David Jaffe, Esq.
Staff Vice President, Legal Affairs
Duane Desiderio, Esq.
Staff Vice President, Legal Affairs
NATIONAL ASSOCIATION OF HOME BUILDERS
1201 15th Street, N.W.
Washington, DC  20005-2800
Telephone: (202) 266-8146
Facsimile (202) 266-8161
ddesiderio@nahb.com

David M. Souders, Esq. (*pro hac vice* application forthcoming)
Nancy L. Hunt, Esq. (*pro hac vice* application forthcoming)
WEINER BRODSKY SIDMAN KIDER PC
1300 19th Street, NW, Fifth Floor
Washington, DC 20036
Telephone: (202) 628-2000
Facsimile: (202) 628-2011
holmes@wbsk.com
*Counsel for all Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that, on the 24th day of December, 2008, a copy of Plaintiffs' Memorandum in

Support of their Motion for Preliminary Injunction was served:

<u>Via facsimile and federal express</u>:

Larry Gregg
Chief, Civil Division
United States Attorney's Office
Eastern District of Virginia
2100 Jamison Avenue
Alexandria, VA 22314

Joseph Hunt
Director
Federal Programs Branch
U.S. Department of Justice
20 Massachusetts Ave., N.W. Room 7348
Washington, D.C. 20530

Michelle Hinchliffe Holmes, Esq.,
Va. Bar No. 75004
Mitchel H. Kider, Esq. (*pro hac vice* application forthcoming)
David M. Souders, Esq. (*pro hac vice* application forthcoming)
Nancy L. Hunt, Esq. (*pro hac vice* application forthcoming)
WEINER BRODSKY SIDMAN KIDER PC
1300 19th Street, NW, Fifth Floor
Washington, DC 20036
Telephone: (202) 628-2000
Facsimile: (202) 628-2011
holmes@wbsk.com
*Counsel for all Plaintiffs*